Ignacio Gonzales PEÑA, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–92–296–CR.

Court of Appeals of Texas,
Waco.

Oct. 6, 1993.

Opinion Denying Rehearing Nov. 10, 1993.

Curtis Pritchard, Lummus, Hallman, Pritchard & Baker, P.C., Thomas D. Whitworth, Cleburne, for appellant.

Dale S. Hanna, Crim. Dist. Atty., William G. Mason, Asst. Dist. Atty., Cleburne, for appellee.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

CUMMINGS, Justice.

Ignacio Peña appeals his conviction for murder. Peña was found guilty by a jury, and the jury assessed punishment at ninety-nine years in prison. In six points of error, he appeals the conviction. We affirm.

In point one Peña contends that the trial court erred in admitting the results of DNA testing into evidence because the State failed to show, by establishing a proper chain of custody, that the blood tested was in fact the blood taken from the victim. In his argument and authorities under his first point of error, Peña points to the testimony of several witnesses concerning the DNA testing procedures used to compare the blood sample taken from the victim to blood stains found on Peña's shirt after his arrest. Nowhere in Peña's brief, however, does he point to any objection to the forensic technician's testimony that the DNA samples taken from the victim's blood matched the DNA samples taken from the blood stains on Peña's shirt. Without a proper objection to the admission of evidence, nothing is preserved for review.[1] As a result, we overrule point of error one.

In point two Peña contends that the court erred in overruling his objections to the testimony of four witnesses because the State failed to disclose their addresses or telephone numbers. Three months prior to trial, the

---

1. *See* Tex.R.App.P. 52(a).

court granted Peña's agreed motion to discover:

> The names, addresses and telephone numbers of witnesses whom the State intends to call in the trial of this matter, either during the guilt/innocence or the punishment phase of the trial.

Even before the discovery motion was presented to the court, the State had provided Peña a list of forty potential witnesses. The address of several of the witnesses, however, was listed as "unknown." In response to Peña's objections to the testimony of Michelle Hanks, Hope Gregory, Tammy Hayes, and Patrick Lemaire, the prosecutor asked the court to take judicial notice of subpoena requests, which included the addresses of the witnesses, filed by the State more than two weeks prior to trial. The prosecutor also pointed out that Tammy Hayes' name and address had been included on a supplemental list of witnesses given to Peña on the morning before trial.

■ It is well established that, under article 39.14 of the Texas Code of Criminal Procedure, decisions involving pretrial discovery of evidence that is not exculpatory, mitigating, or privileged are within the discretion of the trial court.[2] The Court of Criminal Appeals in *Hollowell v. State* held that evidence *willfully* withheld from disclosure under a discovery order should be excluded from evidence.[3] However, the extreme sanction of exclusion should not be imposed absent bad faith or willfulness on the part of the prosecution.[4] There is nothing in the record suggesting that the State willfully or knowingly failed to timely supplement its original witness list with the addresses and telephone numbers of the witnesses. Furthermore, Peña does not contend that he had no actual knowledge of the addresses of the witnesses, particularly in light of the requests for subpoenas filed several weeks prior to trial, or that he was

surprised by the testimony of these witnesses.[5] Because we find no abuse of discretion in permitting the witnesses to testify, we overrule point of error two.

■ In point three Peña contends that the court erred in overruling his running objection to the following testimony of Michelle Hanks concerning statements the victim made prior to her death:

Q  Mrs. Hanks, are you familiar with Teresa Thomas—Were you familiar with, in the time and days prior to this murder, her state of mind regarding whether or not she planned to stay with Tommy Pena or leave him?

A  Yes, sir, I was. She was planning on leaving.

Q  And did she tell you how she planned to leave?

A  Yes she did. She was waiting on a $1200 income tax check to come in the mail where her and her boys were going to move to Fort Worth, to the city, where Tommy would have a harder time finding them.

Q  Did she tell you that?

A  Yes, sir.

Q  To your knowledge, that check never got there?

A  It never made it.

In response to Peña's hearsay objection, the prosecutor argued that the testimony was admissible under Rule 803(3) of the Rules of Criminal Evidence to show the victim's then existing state of mind (such as intent, plan, motive, design, mental feeling, pain, or bodily health).[6] Hanks' testimony was not offered to prove the truth of the victim's statement; instead, it was offered to show her state of mind—she wanted to leave Peña but felt economically trapped.[7] Because Hanks' testimony was properly admit-

---

**2.** *See Kinnamon v. State*, 791 S.W.2d 84, 91 (Tex.Crim.App.1990); Tex.Code Crim.Proc.Ann. art. 39.14 (Vernon 1979).

**3.** 571 S.W.2d 179, 180 (Tex.Crim.App. [Panel Op.] 1978).

**4.** *State v. Wright*, 830 S.W.2d 309, 313 (Tex. App.—Tyler 1992, no pet.).

**5.** *See Bridge v. State*, 726 S.W.2d 558, 566–67 (Tex.Crim.App.1986).

**6.** *See* Tex.R.Crim.Evid. 803(3).

**7.** *See Whitmire v. State*, 789 S.W.2d 366, 371 (Tex.App.—Beaumont 1990, pet. ref'd).

ted as an exception to the hearsay rule, we overrule point of error three.

■ In point four Peña contends that the court erred in overruling his objections to Hanks' testimony concerning two extraneous offenses committed by Peña. At the guilt-innocence phase of the trial, Hanks testified that she was having a cup of coffee with Teresa, six months prior to her death, when Peña came into the apartment drunk. According to Hanks, Peña "picked Teresa up by the hair of the head, and he beat her head." Hanks testified that, while beating Teresa, Peña said, "I ought to kill you. I ought to just cut your throat." Peña objected that Hanks' testimony concerning what happened six months prior to the offense was not relevant, but the State responded that the evidence was admissible to show the defendant's previous relationship with the victim pursuant to section 19.06(a) of the Texas Penal Code.[8] Hanks also testified that, three years before Teresa's death, Peña cut Teresa's long hair with a butcher knife. Again, the court overruled Peña's objection that the incident was too far removed in time to have any relevance to the charged offense.

■ Evidence of prior assaults and threats of the victim by the defendant in a prosecution for murder is relevant to show the defendant's previous relationship with the victim as well as his state of mind at the time of the offense.[9] Therefore, the trial court properly overruled Peña's objections. Finally, we note that Peña did not request a limiting instruction or further object based upon Rule 403 of the Rules of Criminal Evidence.[10] Accordingly, we overrule point of error four.

■ In point five Peña contends that, because the indictment did not expressly allege the use or exhibition of a deadly weapon during the commission of the offense, the court erred in overruling his objection to the deadly-weapon issue in the court's charge on punishment. An affirmative finding that the defendant used a deadly weapon is appropriate when the evidence shows that the defendant used or exhibited a deadly weapon during the commission of an offense.[11] However, an affirmative finding may not be made unless the defendant was given notice that the state would pursue such a finding.[12]

■ Paragraph one of the indictment charged that Peña did "intentionally and knowingly *cause the death* of [the victim] *by cutting* [her] throat *with a sharp object.*" (Emphasis added). Paragraph two charged Peña with aggravated assault by "cutting the throat of [the victim] with *a sharp object that caused the death* of [the victim]." (Emphasis added). According to the Court of Criminal Appeals, "any allegation which avers a death *was caused* by a named weapon or instrument *necessarily includes* an allegation that the named weapon or instrument was 'in the manner of its use ... capable of causing' (since it *did* cause) death."[13] As a result, the indictment gave Peña sufficient notice

**8.** *See* Tex.Penal Code Ann. § 19.06(a) (Vernon Supp.1993).

**9.** *See Gilbert v. State,* 840 S.W.2d 138, 144–45 (Tex.App.—Houston [1st Dist.] 1992, no pet.); *Thompson v. State,* 677 S.W.2d 73, 78 (Tex. App.—Beaumont 1983, pet. ref'd).

**10.** *See Montgomery v. State,* 810 S.W.2d 372, 388 (Tex.Crim.App.1991) (on rehearing).

**11.** At the time of the offense, article 42.12, section 3g(a)(2), of the Texas Code of Criminal Procedure provided that the trial court cannot order probation:

(2) to a defendant when it is shown that the defendant *used or exhibited a deadly weapon* as defined in Section 1.07(a)(11), Penal Code, during the commission of a felony offense or during immediate flight therefrom. Upon af-
firmative finding that the defendant used or exhibited a deadly weapon during the commission of an offense or during immediate flight therefrom, the trial court shall enter the finding in the judgment of the court. Upon an affirmative finding that the deadly weapon the defendant used or exhibited was a firearm, the court shall enter that finding in its judgment.
Act of May 30, 1977, 65th Leg., R.S., ch. 347, § 1, 1977 Tex.Gen.Laws 925, 926, *amended by* Act of May 25, 1991, 72nd Leg., R.S., ch. 541, § 1, 1991 Tex.Gen.Laws 1876, 1876–77 (current version at Tex.Code Crim Proc.Ann. art. 42.12, § 3g(a)(2) (Vernon Supp.1993)).

**12.** *Ex parte Patterson,* 740 S.W.2d 766, 775 (Tex. Crim.App.1987); *Mitchell v. State,* 821 S.W.2d 420, 423–24 (Tex.App.—Austin 1991, pet. ref'd).

**13.** *Ex Parte Beck,* 769 S.W.2d 525, 526 (Tex. Crim.App.1989).

that the State would pursue an affirmative finding.[14] We overrule point of error five.

In point six Peña contends that the court erred in denying his motion to quash the indictment because it was "vague and uncertain." Specifically, he argues that the term *sharp object* did not give him adequate notice to prepare his defense.[15] An indictment is deemed sufficient, however, when it gives the defendant notice of the particular offense charged.[16] Because the indictment in this case sufficiently alleged the acts and the type of instrument allegedly used by Peña, the trial court did not err in denying his motion to quash the indictment. We overrule point of error six.

We affirm the judgment.

## OPINION ON MOTION FOR REHEARING

On original submission, we declined to address the merits of Peña's first point of error because his brief failed to point to any objection to the forensic technician's testimony that the DNA samples taken from the victim's blood matched the DNA samples taken from the blood stains on Peña's shirt. By motion for rehearing, Peña now points to his "chain-of-custody" objection, made outside the presence of the jury, to the testimony of Judith Floyd, the forensic technician who conducted the DNA testing of the blood samples taken from the victim and from Peña's shirt. Therefore, we will address the merits of his first point. Peña contends that the trial court erred in admitting the results of DNA testing into evidence because the State failed to show, by establishing a proper chain of custody, that the blood tested was in fact the blood taken from the victim.

Dr. Arthur L. Raines, the county medical examiner who conducted the autopsy of the victim on February 26, 1991, testified

that two red-topped tubes of blood were taken from the victim's body during the autopsy by Sally Messick, a nurse under his supervision. According to Dr. Raines, the samples were stored in the medical examiner's section of the laboratory refrigerator. His records indicated that no one else gained custody of the blood samples until they were transferred to Glen E. Thompson, a deputy sheriff for Johnson County, on August 1, 1991.

Glen Thompson testified that he picked up the blood samples from the medical examiner's laboratory on August 1, 1991. According to Thompson, Dr. Raines supervised the packaging of the blood samples in breakproof containers. Thompson took the samples directly to Dallas and delivered them to an evidence coordinator at Gene Screen, a private DNA testing laboratory. The evidence coordinator signed the chain-of-custody form, recorded the samples in the laboratory log, and gave Thompson a receipt.

Judith Floyd testified that she received the blood samples on August 1 and that they were stored in a locked laboratory until she began the testing on August 5. According to Floyd, after being assigned a sample for testing, she is the only one who handles that sample until it is returned to the agency which initially referred it to Gene Screen. Finally, Floyd testified that the samples were returned to Thompson on November 19, 1991.

Peña's complaints regarding the chain of custody center around the State's failure to call Nurse Messick to testify at trial. Because Dr. Raines testified that Messick drew the blood under his supervision, testimony from the nurse who actually drew the blood was not necessary.[1] Dr. Raines also testified that the blood was appropriately labeled and that there was no reason to believe that anything out of the ordinary

14. *See id.* at 526–27.

15. *See Adams v. State,* 707 S.W.2d 900, 903 (Tex. Crim.App.1986).

16. *DeLeon v. State,* 758 S.W.2d 621, 623–24 (Tex. App.—Houston [14th Dist.] 1988, no pet.) (holding that an indictment which alleged the defendant "stabbed [the victim] with a knife" gave sufficient notice of the particular offense

charged); *Medrano v. State,* 701 S.W.2d 337, 338–39 (Tex.App.—El Paso 1985, pet. ref'd) (holding that the use of the term *sharp instrument* was sufficient to set forth the manner of death).

1. *See Yeary v. State,* 734 S.W.2d 766, 769 (Tex. App.—Fort Worth 1987, no pet.).

routine for handling blood occurred in this case. Minor theoretical breaches in the chain of custody will not affect admissibility in the absence of affirmative evidence of tampering.[2] Further, Rule 901(a) of the Texas Rules of Criminal Evidence provides, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."[3] As long as the trial court believed that a reasonable juror could find the evidence has been authenticated or identified, the court should admit the evidence.[4] We consider the demonstrated chain of custody sufficient to establish that degree of security and evidentiary integrity justifying admission of the DNA test results through the forensic technician's testimony.[5] Accordingly, we overrule point of error one.

We deny Peña's motion for rehearing.

---

**2.** *Moore v. State,* 821 S.W.2d 429, 431 (Tex. App.—Waco 1991, no pet.).

**3.** Tex.R.Crim:Evid. 901(a).

**4.** *See Coleman v. State,* 833 S.W.2d 286, 289 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd).

**5.** *See Stone v. State,* 794 S.W.2d 868, 870 (Tex. App.—El Paso 1990, no pet.).